UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA,**

v.                                                         Case No.:  8:18-CR-539-JSM-AAS

**JOSHUA KOEZENO**

_____ :

**DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant, Joshua Koezeno ("Mr. Koezeno"), by and through his undersigned counsel, respectfully submits this sentencing memorandum for this Honorable Court's consideration. Mr. Koezeno requests this Court determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. § 3553, and thus impose a sentence of 120 months incarceration to run concurrently with his undischarged State sentence in Pasco County cases 17-CF-2635, 17-CF-3229, and 17-CF-3871.

**STATEMENT OF FACTS**

*Procedural History*

1. On March 14, 2019, Mr. Koezeno pled guilty to count one of the indictment for Possession with the Intent to Distribute 50 grams or more of Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  Doc. 29.

2. This case is presently set for sentencing on July 9, 2019.  Doc. 34.

*Advisory Guideline Calculation*

3. The Presentence Report (PSR) calculates Mr. Koezeno's total offense level as a level 27 with a criminal history category of VI. PSR at ¶¶ 5; 11.  Accordingly, Mr. Koezeno faces an advisory guideline sentencing range of 130 to 162 months of incarceration. *Id*. at ¶ 15.

4. Despite the calculated guideline range, Mr. Koezeno's offense carries a ten-year mandatory minimum penalty.

The parties have no objections to the advisory guideline range.

## CONCURRENT v. CONSECUTIVE PRISON TERM

18 U.S.C. § 3584(a) states that, "[i]f multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively…. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." Using the authority within 18 U.S.C. § 3584, a federal sentencing judge can specifically order the federal sentence imposed to run concurrently or consecutively to a State sentence. Henry J. Sadowksi, *Interaction of Federal and State Sentences When the Federal Defendant is Under State Primary Jurisdiction* 3-4 (2006) citing *United States v. Williams*, 46 F.3d 57 (10th Cir.), *cert denied*, 116 S.Ct 92 (1995); *United States v. Ballard*, 6 R.3d 1502 (11th Cir. 1993); *United States v. Hardesty*, 958 F.2d 910 (9th Cir. 1992); *Pinaud v. James*, 851 F.2d 27 (2d Cir. 1988); *Salley v. United States,* 786 F.2d 546 (2d Cir. 1986) for consecutive authority and citing *United States v. Fuentes*, 107 F/3d 1515, 1519 n.6 (11th Cir. 1997) for concurrent sentencing authority. In practice, at sentencing the Court must state on record and it must be memorialized within the judgment and sentence, the Judge's order with respect to concurrent versus consecutive time on the Federal sentence. Henry J. Sadowksi, *Interaction of Federal and State Sentences When the Federal Defendant is Under State Primary Jurisdiction* 3-4 (2006). "To allow the Federal sentence to commence, the Bureau of Prisons

designates the state correctional institution (the primary custodian) for service of the federal sentence." *Id* at 4.

18 U.S.C. § 3584(b) guides the Court to look at 18 U.S.C. § 3553(a) factors when considering imposition of a concurrent versus consecutive sentence.  Further guidance for the court in Mr. Koezeno's case is United States Sentencing Guideline §5G1.3(d).  This guideline states that, "[i]n any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." Commentary Application Note 4 states:

*<u>In General</u>.—Under subsection (d), the court may impose a sentence concurrently, partially concurrently, or consecutively to the undischarged term of imprisonment. In order to achieve a reasonable incremental punishment for the instant offense and avoid unwarranted disparity, the court should consider the following:*

*(i)   the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));*

*(ii)   the type (<u>e.g.</u>, determinate, indeterminate/parolable) and length of the prior undischarged sentence;*

*(iii)   the time served on the undischarged sentence and the time likely to be served before release;*

*(iv)   the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and*

*(v)   any other circumstance relevant to the determination of an appropriate sentence for the instant offense."*

Part of the conduct Mr. Koezeno is currently serving a prison term for (Pasco County case 17-CF-3871), occurred four days after the conduct in the instant case. Should Mr. Koezeno's sentence be in accord with even the low end of the recommended guideline sentence, he stands to go to prison for almost 11 years. If Mr. Koezeno is sentenced to a consecutive sentence, this term wouldn't begin until his release date for his State charges; June 23, 2022.[1] If this were the case, Mr. Koezeno would not get out of prison custody until potentially the year 2030 (11 x .85 = 9.35. 9.35 – 1 (RDAP) = 8.35) if he receives all Federal gain time and serves 85% of his prison sentence. AUSA Taylor Stout has no objection to a concurrent sentence as requested for Mr. Koezeno.

## MEMORANDUM OF LAW

This memorandum examines the issue of whether a sentencing range of 130-162 months is in fact sufficient but not greater than necessary to comply with sentencing directives laid out in 18 U.S.C. § 3553(a)(2), or if a sentence to the minimum mandatory term of 120 months to run concurrently with Mr. Koezeno's undischarged State prison sentence would be just as effective and sufficient. An examination of section 3553 is critical in the instant case since many of its sentencing factors supports Mr. Koezeno's request for a variance. *See* 18 U.S.C. § 3553(a).

I. ***Booker and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a)***

Pursuant to *United States v. Booker,* 543 U.S. 220, 245-67 (2005), a court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime

---

[1] According to the Florida Department of Corrections website, an offender's "[r]elease [d]ate subject to change pending gain time award, gain time forfeiture, or review. A 'TO BE SET' [r]elease [d]ate is to be established pending review.

4

and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).[2]

To guide a court's discretion, section 3553(a)(2), requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors. Against this backdrop of factors, Mr. Koezeno respectfully submits that a variance is warranted in his case. Indeed, as the following sections demonstrate, an advisory guideline sentence would violate the requirement that a defendant's sentence be sufficient but not greater than necessary to satisfy the purposes of § 3553(a). *See Pepper v. United States*, 562 U.S. 476 (2011)(a "sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary"). As this memorandum establishes, applying the § 3553(a) factors to Mr. Koezeno's case supports the imposition of a 120 month, concurrent sentence.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The significance of the first factor lies in its comprehension that a court cannot merely focus on a defendant's crime in determining his sentence. Rather, a court must consider the offense against the backdrop of a defendant's life. Indeed, the Supreme Court has emphasized "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and

---

[2] As the Supreme Court recently reaffirmed,"[s]entencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence. This durable tradition remains, even as federal laws have required sentencing courts to evaluate certain factors when exercising their discretion." *Dean v. United Stats*, 127 S. Ct. 1170, 1175 (2017) (internal citation omitted).  Moreover, judicial discretion to consider all information about the case and the offender is a time-honored principle of American law and has historically been understood as a means of ensuring justice in individual cases.  *See Koon v. United States*, 518 U.S. 81,113 (1996) *accord Pepper v. United States*, 562 U.S. 476, 487-88 (2011).  Indeed, Congress has expressly affirmed a judge's discretion to consider the fullest information possible. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

characteristics." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citation omitted). Consistent with this perspective, one federal jurist has concluded:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006)(Rakoff, J.).

*The History and Characteristics of the Defendant*

The tenet in *Adelson* that a defendant's criminal conduct must be measured against his overall life has resonance in the instant case. While the Adelson Court contemplated a balance of an individual's misgivings versus their good will, for Mr. Koezeno the analysis is not as simple. Mr. Koezeno is a young man, only 26 years old, who has been thrust into a life of misfortune since childhood.

Mr. Koezeno is the son of Jerry Lee Koezeno, Sr. and Dawn Koezeno.  As indicated in paragraph 41 of his pre-sentence report, Mr. Koezeno's father abandoned him before he knew him and has made absolutely no effort to contact his son nor be a part of his life.  Surely it is more the responsibility of the parent to foster a loving relationship with their child than vice versa.  In any event, absent any interest from a father, it is unlikely that a child would initiate contact, if for no other reason but the fear of their rejection being confirmed.

As soon as Jerry Koezeno, Sr. was out of the picture, Dawn Koezeno married James Koezeno, Sr., Mr. Koezeno's uncle.  In spite of the fact that James Koezeno, Sr. was Mr. Koezeno's blood relative, the treatment divvied to Mr. Koezeno as a child was brutal to say the least.  Constantly living in a cloud of addiction to crack cocaine and alcohol, James Koezeno, Sr.

routinely beat Mr. Koezeno with his fists, sticks, and a belt. The abuse sustained by Mr. Koezeno was atrocious. This was not corporal punishment at the hands of a disciplinarian, rather, this was a grown man beating a child with objects of torture, striking as hard as he could wherever the weapon fell. Isolated the beatings were not; this was the common way of life for Mr. Koezeno as a boy.

While this period of Mr. Koezeno's life is difficult for him to recall, he believes that the bruises and scars left upon his body by his step-father caused the department of children and family services to be called to his home and ultimately his removal therefrom. Mr. Koezeno believes he bounced from foster home to foster home for approximately one year. His memory of these homes tells more of the foster parent's desire for supplementary income than a place of love and nurture. In one specific instance Mr. Koezeno recalls sleeping on a bottom bunk, beneath a pre-teen boy who routinely wet the bed. Over and over, each night this young man would urinate in his bed and it would run off the side and onto Mr. Koezeno's mattress with Mr. Koezeno having no recollection of the foster family addressing the issue or making a diligent attempt to clean either boy's bed.

Mr. Koezeno recalls that after approximately one year in foster care he went back to live with his family but did not see a considerable amount of improvement in his relationships with his parents. Money was scarce and what little there was, Mr. Koezeno believes was spent on drugs. Mr. Koezeno believes social security checks were received by the family for himself and his brother and primarily that's what the family relied up on to survive.

Mr. Koezeno has two brothers and one sister. He has only written contact with his sister and has essentially lost contact with all remaining blood relatives. When asked about this, Mr. Koezeno, in an almost bashful or regretful response, will put his head down and mention that

after he was sentenced on a prior case in State court that he didn't want to burden his family with his addiction issues and troubles. While any relationship requires effort from both parties (it doesn't seem that Mr. Koezeno's family is overly interested in being a part of his life), it is as if Mr. Koezeno has withdrawn from his family partly due to not wanting to burden them and partly because he is trying to leave behind anything that reminds him of his horrific childhood.

      Mr. Koezeno is a man who has never had stability in his life. He received no care of consequence from his parents, was routinely beaten, and never felt he had a place in the world. He has been the product of an abhorrent environment and has emulated the addiction of his parents. This Honorable Court will review Mr. Koezeno's pre-sentence report and recognize that he has affiliated himself with the Unforgiven white supremacist group. While difficult to understand the desire to affiliate with such a group, it may partially be explained by Mr. Koezeno's childhood and partially by a need to affiliate with a group while in the prison system. It is well known that race conflict within the prison system is common.

      According to psychologist Evan Staub, when asked why would a person join a white supremacy group, he indicates that, "i[t] usually involves them finding no other socially acceptable and meaningful ways to fulfill important deeds- the need for identity; the need for a feeling of effectiveness; the need for a feeling of connection." (*Available at https://www.usnews.com/news/national-news/articles/2017-08-23/what-makes-people-join-hate-groups-studies-say-childhood-torment-social-isolation*). Staub further cites that often people who seek these groups out are people who don't feel as if they have succeeded in life or have had a chance to succeed amongst normal society. *Id.* Staub explains, "[t]hey may come from families that are problematic or families where they're exposed to this kind of extreme views of white superiority and nationalism. If you don't feel you have much influence and power in the

world, you get a sense of power from being part of a community and especially a rather militant community." *Id.* Further indication as to why perhaps Mr. Koezeno was drawn to the Unforgiven is a study performed by START, the National Consortium for the Study of Terrorism and Responses to Terrorism ("START"). The START study's interim findings show that 45% of those individuals interviewed reported being the victim of childhood physical abuse…. and 46% of those interviewed reported being neglected as a child.

The implications as they pertain to Mr. Koezeno are undeniable. It is doubtful, short of a change of mindset, that Mr. Koezeno would say he joined the Unforgiven due to his childhood abuse. Regardless, his past is indicative of someone who would be an easy target for a group of the like and given the human need for acceptance, it is conceivable that this bore on his decision to affiliate.

While Mr. Koezeno has a considerable criminal history and has affiliated himself with a group outside of society's mainstream, he does desire to have a relationship with his family. He craves a relationship with his nieces and nephews, trying to provide as best he could during family Christmas celebrations and birthdays in the past. He has nothing to his name, yet when he works, he tries to give of himself to those he loves.

Mr. Koezeno suffered extreme physical and psychological abuse throughout his childhood at the hands of his step-father. It is permissible for this Honorable Court to consider such abuse in considering a departure (or variance). *See U.S. v. Rivera,* 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions...in extraordinary circumstances…district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the

defendant's commission of the offense."); *see also Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist, J., joined by Burger, C.J., White, and O'Connor, J., dissenting) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens."). In addition to suffering abuse as a child, Mr. Koezeno had no guidance as a child, amounting to abandonment and the necessity to essentially raise himself. This fact is implicit in his removal from his home, or stated otherwise, his parents' temporary stripping of parental responsibility by the State. This is a factor that should be considered in considering a variance for Mr. Koezeno. *See U.S. v. Floyd,* 945 F.2d 1096 (9th Cir. 1991) (in a drug case, the court affirmed a departure from the guideline range of 30 years to life, down to 17 years because of defendant's abandonment by his parents and lack of guidance as a youth –rendering defendant less culpable. This Court also observed that "a criminal sentence must reflect an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime"). *See also Landrigan v. Schriro,* 441 F.3d 638, 648 (9th Cir. 2006) ("Where a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse.").

When the totality of Mr. Koezeno's life is analyzed, it is difficult to understand where he was psychologically as a young boy and how that influenced his conduct as an adult. Summarily, he wasn't wanted by his biological father, was clearly hated by his step-father, and had no safe harbor in his mother, or anyone else for that matter. He has fallen into the addiction footsteps of his parents and in turn, has made decisions throughout his adult life akin to an animal that suffers regular beatings. He is not a man without fault but he is too not the sum of this, his worst deed.

*The Nature and Circumstances of the Offense*

Mr. Koezeno's conduct in the instant case amounts to connecting a confidential informant and undercover officer to Mr. Koezeno's source of methamphetamine supply, Randi Potter ("Potter") and ultimately purchasing 84.23 grams of "Ice" from Potter on behalf of the confidential informant. While Mr. Koezeno's pre-sentence report indicates that he sold the methamphetamine to the confidential informant, his role was in connecting the supplier and purported end user and exchanging money for drugs. Mr. Koezeno's role was that of middle man or facilitator as opposed to supplier. Given no financial windfall, it is difficult to surmise why Mr. Koezeno would agree to such a situation.

Despite Mr. Koezeno's failures in the instant case, he has never been an individual motivated by greed or avarice. Rather, his criminal history reflects a man with a heavy addiction to a serious drug who commits crimes to sustain his habit. While Mr. Koezeno's financial circumstances and addiction issues do not excuse his criminal conduct, it does mitigate his blameworthiness. Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005)(stating that while a defendant's blameworthiness be considered according to the nature and seriousness of the crime, it can also be assessed according to "the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity"); *see also United States v. Genao*, 831 F.Supp. 246, 254 (S.D.N.Y.1993)("Can we really say we have a rational system of justice when the court, in imposing sentence, is stripped of the power to even consider the socio-economic and educational background of the defendant"). *Griffin v. Illinois*, 351 U.S. 12, 23 (1956) (Frankfurter, J., concurring)("The law, in its majestic equality, forbids the rich as well as the

poor to sleep under bridges, to beg in the streets, and to steal bread.")(citing Anatole France as quoted in in Cournos, A Modern Plutarch (1928), p. 27).

Despite the foregoing mitigation, Mr. Koezeno is remorseful for his conduct. He needs and most importantly, wants help with his addiction issues. He would probably be well served to receive counsel for his traumatic childhood. Returning to contention that the first § 3553 factor requires a sentencing court to view a defendant's crime through the lens of her entire life, Mr. Koezeno's case establishes the wisdom of such a perspective. For the essential question present, is whether Mr. Koezeno's crime reflects his true nature, or whether it is a result of childhood beatings, neglect of his parents, and the stripping of his youthful innocence at the hands of irresponsible adults around him. When the totality of Mr. Koezeno's life is considered, it seems that his criminal behavior, at least in part, is precipitated from his lack of guidance, childhood love, and sense of belonging both then and now. Thus, if *Adelson's* admonition that courts should consider a defendant's overall existence in imposing his sentence has any meaning, the undersigned respectfully submits a variance is warranted in Mr. Koezeno's case.

**2.  The Need for the Sentence Imposed**

    *A.  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

In imposing a just sentence, this Court should also consider the significant punishment of the collateral consequences of Mr. Koezeno's felony conviction. Based on his conviction, Mr. Koezeno will face an overwhelming number of collateral consequences. A recent congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), available at http://www.gao.gov/products/GAO-

17-691.pdf, summary excerpt attached hereto as Exhibit 4. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*.

Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such an impact at sentencing *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016)(Block, J.)(varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). *Nesbeth* concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence." *Id*.; *see also* Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds., 2002).

In granting a variance in *Nesbeth*, the court asserted that the collateral effects of a criminal conviction can be "devastating" to a defendant. *Nesbeth*, 2016 WL 3022073, at *1.

> Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'

*Id*. (citation omitted). Mr. Koezeno, due to prior felony convictions, has experienced this first hand.

  B.  *To afford adequate deterrence to criminal conduct*

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

13

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter. org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom?"*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id*. at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 5. In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

  C. *To protect the public from further crimes of the defendant*

Having established that prison sentences, regardless of length, has no impact on general deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also supports

14

Mr. Koezeno's request for a variance. This section focuses on studies establishing that incarceration has no effect on recidivism.

   1.   *The relationship between incarceration and recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). As the following discussion establishes, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. *See* Ex. 6 at 4; *see also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017)(concluding that research shows a "weak relationship between incarceration and crime reduction, and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration").[3] Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *See id*. There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders - leads to increased

---

[3] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level. . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887). ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Finally, the 2016 study concludes that community correction programs are more effective than incarceration in reducing recidivism. Ex. 6 at 5. *See also* R. S. Frase et al, *Criminal History Enhancements Sourcebook* (2015)(discussing studies establishing the crime that "custody is associated with higher rates of re-offending than community sentences.") Thus, the most effective to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.

In absence of a deterrent effect, Mr. Koezeno submits that a sentence of 120 months is sufficient, but not greater than necessary to comply with the provision of § 3553.

> D.   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Mr. Koezeno does have an articulable substance abuse problem and does desire drug treatment while in the bureau of prisons. Respectfully, he requests that this Court recommend

the RDAP program in the Bureau of Prisons.

3.     **The Kinds of Sentences Available**

Mr. Koezeno is subject to a ten year minimum mandatory prison sentence. As such, short of a safety valve relief or a motion for substantial assistance, neither of which are available to Mr. Koezeno, Mr. Koezeno is only eligible for a prison term.

4.     **The Kinds of Sentences and the Guideline Sentencing Range Established**

As noted earlier in this memorandum, the guideline sentence in Mr. Koezeno's case is 130-162 months. Because of the mandatory minimum penalty, this Court cannot impose a sentence less than 120 months. Nevertheless, in support of his argument for a ten year sentence, Mr. Koezeno submits that the recommended guideline range calls for an overly harsh sentence. Indeed, the guideline in Mr. Koezeno's case is driven by the purity of the methamphetamine he obtained for the confidential informant. Moreover, the PSR's calculated sentence of 130 to 162 months of imprisonment is predicated on drug guidelines that a majority of federal judges believe are too harsh. Indeed, "73.7 percent of district court judges and 82.7 percent of circuit court judges [rate] drug punishments as greater than appropriate to reflect the seriousness of drug trafficking offenses." (*See* USSC, *Fifteen Years of Guideline Sentencing, An Assessment of How Well the Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 52.

Respectfully, based upon the foregoing, Mr. Koezeno submits that the requested sentence of ten years of imprisonment is sufficient but not greater than necessary to satisfy the objectives of § 3553.

5.     **The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

Because of the recurring and essential problems with the guidelines, drug sentences necessarily reflect widespread judicial disagreement with the guidelines. For example, in fiscal

17

year 2014, sentences below the guideline range were imposed in over 60% of all drug cases, including departures that were government sponsored. (*See* U.S. Sent'g Comm'n, *2014 Sourcebook of Federal Sentencing Statistics*, tbl. 27).

Considering the types of sentences that have been imposed on drug cases, Mr. Koezeno submits that a ten-year prison sentence is not antagonistic to the concept of disparity.

**6.     The Need to Provide Restitution to Any Victims of the Offense.**

Restitution is not applicable in this case.

## CONCLUSION

As the foregoing establishes, the unique circumstances presented in Mr. Koezeno's case warrant a variance below the applicable guideline range. Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, Mr. Koezeno respectfully submits that a variance is appropriate pursuant to this significant and paramount sentencing statute.

Respectfully submitted this 25th Day of June, 2019.

/S/ Jason M. Mayberry
MAYBERRY LAW FIRM
Jason M. Mayberry
FBN- 36212
Attorneys for the Defendant
3902 Henderson Boulevard
Suite 208-136
Tampa, FL 33629
Ph-813-444-7435
Fx-727-755-0098

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by Electronic Mail to the Office of the United States Attorney, this 25th day of June, 2019.

/S/ Jason M. Mayberry
JASON M. MAYBERRY, Esq.